UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| NEXT MILLENNIUM TELECOM CO., <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN SIGNAL CORPORATION, <br><br> Defendant. | Case No. 20-CV-178-JPS <br><br><br> **ORDER** |

On February 5, 2020, Plaintiff, Next Millennium Telecom Company, filed this action pursuant to 28 U.S.C. § 1332, claiming that Defendant, American Signal Corporation, breached its contract with Plaintiff when it delivered several shipments of sub-par sirens. (Docket #1). On April 1, 2020, Defendant filed a motion to dismiss, and on April 21, 2020, Plaintiff timely filed an amended complaint. (Docket #7, #11). On May 5, 2020, Defendant filed a second motion to dismiss. (Docket #12). That motion is now fully briefed, and includes a contested motion for leave to file a sur-reply. (Docket #18). For the reasons explained below, the Court will grant the motion to dismiss in part and dismiss the second, fourth, and fifth claims of the amended complaint. The first motion to dismiss, as well as the motion for leave to file a sur-reply, will be denied as moot.

1.  **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b) provides for dismissal of complaints which, among other things, fail to state a viable claim for relief. Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint must provide "a short

and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the. . .claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *Kubiak v. City of Chi.*, 810 F.3d 476, 480 (7th Cir. 2016) (citation omitted). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Olson v. Champaign Cty.*, 784 F.3d 1093, 1099 (7th Cir. 2015) (citations and quotations omitted). In reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kubiak*, 810 F.3d at 480–81. However, the Court "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (citations and quotations omitted).

**2. RELEVANT FACTS**

Plaintiff is a Saudi Arabian information and technology company that contracted with the Saudi government to purchase and implement a mass emergency alert system for Saudi Arabia's Eastern Province. Defendant is a Wisconsin-based company that manufactures a mass alarm system called "NexGen." At some point, Plaintiff and Defendant began negotiations regarding the sale of mass alarm systems for use by the Saudi government. Defendant prepared a proposal, in which it offered to sell Plaintiff state-of-the-art siren systems and provide technical installation support to Plaintiff.

In January 2015, employees from the plaintiff company and agents of the Saudi Ministry of Civil Defense went to Milwaukee, Wisconsin to

"ensure the legitimacy of [Defendant's] proposal and to verify that Defendant's emergency alert/mass notification siren system met all the specifications and requirements of the Saudi Arabian government." (Docket #11 ¶ 10). During this visit, Defendant made the following representations to Plaintiff and the Saudi Ministry of Civil Defense:

1. Defendant "has been manufacturing, selling, installing, and maintaining emergency alert/mass notification siren systems since 1961, [and] presented. . .a full demonstration" as to how the system operates. *Id.* ¶11.

2. Defendant "has industry-leading and up-to-date technology, and. . .its emergency alert/mass notification siren system had been properly tested prior to being placed into operation in the field." *Id.* ¶ 12.

3. Defendant "was capable of assisting in both the change of the traditional emergency notification siren system and installation of its new emergency alert/mass notification siren system (Nexgen) to comply with ministry specifications on Plaintiff's behalf throughout eastern Saudi Arabia." *Id.* ¶ 14.

On April 16, 2015, after the visit to Milwaukee, Defendant entered into "A Memorandum of Understanding on Supplying [sic] of (690) electronic omnidirectional early warning sirens and (12) control points system for the eastern province" ("the MOU") with Plaintiff. (Docket #11-1). The MOU purports to be an "agreement" to carry out the supply and instillation of 690 sirens on the Eastern Province of Saudi Arabia. *Id.* at 1–2. The parties "agree[d]" that the MOU's purpose was "to stimulate and support upgrade, supply, and associated activities in accordance with the following scope of collaboration." *Id.* at 2. The "scope" explained that:

> Both parties agree to develop this MOU for [the] Saudi Directorate of Civil Defense in the Eastern Project for [the] supplying and installation of Qty (690) Electronic & omni-directional 123 dB sirens and control centers in the region.

> [Defendant] will continue to update the local Agent throughout the progress of the project who may provide assistance when requested or needed.
>
> Supplying of siren system components Per Nextel Purchase order. ([Defendant has] already provided their proposal based on the technical description supplied by NEXTEL[1] for the tender document for [the] Civil Defense needs and requirements)
>
> Delivery of system components (as per [Defendant]'s equipment list and NEXTEL purchase order)
>
> Sharing of project activities (Planning, Implementation, and Technical support).
>
> Periodic trainings for NEXTEL sales and technical staff. This is not something that was quoted or a line item on the purchase order. We will agree to do this for up to 10 people per visit, 2 visits per year, but [Defendant] will not pay for Nextel expenses for travel or lodging or any travel related expenses.

*Id.*

The MOU provides for the terms of payment and delivery. *Id.* at 6. It also includes a timespan for the duration of the agreement, as well as termination procedures, explaining that termination would "commence upon signature by both parties and shall remain in force for [a] period of (2) years." *Id.* at 6. The MOU refers to the NEXTEL purchase order (hereinafter, "the purchase order") throughout, and does not claim to be the final iteration of any agreement. Notwithstanding a section regarding intellectual property rights,[2] the MOU does not contain any language indicating that the parties foresaw an additional written agreement.

---

[1]"NEXTEL" appears to be how Plaintiff refers to itself.

[2]This section reads, "Parties shall commit themselves to the observance of intellectual property and ensure that the intellectual property rights are fully

The MOU seems to be a contract; however, toward the end of the agreement, the MOU contains language that renders it somewhat ambiguous. Under "compensation," the MOU states that "[i]n normal cases, this agreement should not create any legal or financial obligations between the parties. It is made to facilitate and develop a reasonable and mutually beneficial process for supplying and technical support activities [sic]." *Id.* Underneath this is a choice-of-law provision and a choice of venue provision for the "Agreement." *Id.* Finally, the agreement states, "[t]he signing of this MOU is not a formal undertaking. It implies that the signatories will strive to reach, to the best of their ability, the objectives stated in the MOU." *Id.* at 8.

The purchase order,[3] which is referenced throughout the MOU, contains the following information: a description of the items to be shipped

---

addressed and agreed upon consistent with the existing laws and regulations, prior to the initiation of each business collaborative activity." *Id.* at 7.

[3]The complaint refers to the "contract/memorandum," or "contract and memorandum" throughout, and the MOU, in turn, refers repeatedly to the purchase order. Plaintiff has attached the purchase order to its response to the motion to dismiss. (Docket #15-1). Neither party disputes the purchase order's authenticity; Defendant simply takes issue with the Court considering information outside the complaint at this juncture.

Typically, courts will not consider material outside of the pleadings on a motion to dismiss. Nevertheless, the Court has discretion to consider documents outside of the pleadings when they are central to the plaintiff's claim and when the parties do not dispute their authenticity. *Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009). In this case, there is no dispute as to authenticity, and the purchase order is central to Plaintiff's claim. The complaint does not only discuss the MOU, but the "contract/memorandum" or "contract and memorandum." The MOU, which was attached to the complaint, makes frequent reference to the purchase order—thus, the pleadings make reference to the purchase order many times. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). Moreover, the purchase order sets forth the crux of the complaint's issues, i.e., that 690 sirens and

(including model and unit numbers); the quantity of the items to be shipped; and the price of the items to be shipped. (Docket #15-1 at 2). The date on the purchase order reads:

DATE: 1/03/2015

This could be April 3, 2015, or March 4, 2015, depending on which date format the contract drafter followed. Additionally, it is possible that the first integer might be a 1, rendering the purchase order date either January 3, 2015 or March 1, 2015. In any scenario, however, the purchase order was made at least several days before the first party signed the MOU, on April 7, 2015.

In June 2015, Plaintiff received the first shipment of sirens from Defendant. The shipment was incomplete because it was "shipped without the accompanying control systems and related software packages," as provided for under the MOU. (Docket #11-1 ¶ 24).

In September 2015, Plaintiff received another shipment that was also incomplete, this time because it did not include necessary remote terminal unit ("RTU") controls. *Id.* ¶ 25. These RTU controls were not shipped until January 2016. Defendant also failed to provide "required on-site factory support training" that the MOU contemplated. *Id.* ¶ 26.

After receiving these shipments, Plaintiff's engineers inspected the sirens and determined that they "had never been properly tested nor placed for use in the field"; that the RTU control systems were not compatible with the sirens; that the RTU controls were deficient; and that the entire system required a missing component called NEXGEN CSC-960, which was not

---

component parts were ordered, paid for, and delivered, but did not work as promised. Therefore, the Court will consider the purchase order for the purpose of the motion to dismiss.

delivered "due to change in the original design." *Id.* ¶¶ 28–30. Moreover, once the sirens were installed, they "failed to emit sufficient sound so as to effectively alert those located within the respective geographic target areas." *Id.* ¶ 33.

Plaintiff alleges that "at all times relevant" it repeatedly demanded that Defendant either refund the payments, compensate for necessary repairs and replacements, or make repairs under the warranty. *Id.* ¶¶ 37, 42. Plaintiff brings claims for breach of contract under the MOU, unjust enrichment, breach of express and implied warranties, fraudulent inducement, and rescission. Each of these claims will be analyzed in turn.

### 3.  ANALYSIS

#### 3.1  Count One – Breach of Contract

"In order that a contract may arise, three things must concur: [f]irst, the offer; second, the acceptance; and, third, the consideration." *Briggs v. Miller*, 186 N.W. 163, 164 (Wis. 1922). "[A]n offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain." *Farnsworth, McKoane & Co. v. N. Shore Sav. & Loan Ass'n*, 504 F. Supp. 673, 676 (E.D. Wis. 1981) (quoting *Goebel v. Nat'l Exchangors, Inc.*, 277 N.W.2d 755, 765 (Wis. 1979)). A plaintiff must allege facts that demonstrate "(1) 'a contract between the plaintiff and the defendant'; (2) 'failure of the defendant to do what it undertook to do'; and (3) damages." *Brunclik v. Keystone Insights*, 932 N.W.2d 191 (Table), 2019 WL 2588425, at *2 (Wis. Ct. App. 2019) (quoting *Brew City Redev. Grp., LLC v. The Ferchill Grp.*, 714 N.W.2d 582, 588 (Wis. Ct. App. 2006)).

Plaintiff alleges two potential avenues through which a contract was formed. First, Plaintiff has adequately alleged that the MOU is a contract.

Second, Plaintiff has adequately alleged that the purchase order, either standing alone, together with the MOU, or as part of the parties' course of conduct, is a contract. At this juncture, it is the Court's task to evaluate whether Plaintiff's allegations, if true, point to the existence of a contract that was breached. It is not for the Court to evaluate evidence regarding the parties' intentions in forming the contract, nor whether any breach, in fact, occurred. As the discussion below demonstrates, at this stage, Defendant cannot litigate away from the fact that Plaintiff has sufficiently alleged a breach of contact.

### 3.1.1 The MOU Contract

Under Wisconsin state law, "[a]greements to agree are unenforceable when there is no agreement as to material terms." *Paul R. Ponfil Tr. v. Charmoli Holdings, LLC*, 935 N.W.2d 308, 311 (Wis. Ct. App. 2019) (finding that a settlement agreement was not an enforceable contract because the parties never agreed upon the terms of indemnity, which the court determined were material). However, the mere fact that the parties drafted an MOU rather than a contract is not dispositive. For example, in *Brunclik*, the Wisconsin Court of Appeals had no issue finding that a "Memorandum of Understanding between the parties, though sparse in its wording, clearly constitute[d] a contract" because it unambiguously stated that one party would be compensated at a specific rate for his services "until certain fundraising efforts were reached," at which point, he "would be entitled to a salary increase." 2019 WL 2588425, at *2. Similarly, the Eighth Circuit has held that a memorandum of understanding could be a binding contract if the evidence demonstrated that the parties intended to be bound, notwithstanding a clause requiring approval from the board of directors.

*Clarke Cty. Dev. Corp. v. Affinity Gaming, LLC*, 826 F.3d 1090, 1094 (8th Cir. 2016).

By contrast, in *Estate of Sheppard ex rel. McMorrow v. Specht*, the Wisconsin Court of Appeals found that a memorandum of understanding "was a starting point, not a final contract" when it contained (1) express language stating that it was not legally binding because the parties contemplated another agreement detailing each parties' specific rights and obligations; (2) the MOU was written speculatively; (3) and the MOU lacked specificity. 824 N.W.2d 907, 912 (Wis. Ct. App. 2012). Additionally, this Court determined that an MOU was not a contract when it was one of several negotiation attempts, and the defendant provided a counteroffer to the MOU, which was never accepted. *Clark Tech. LLC v. Corncob Inc.*, Case No. 19-CV-1559, 2019 WL 4279462, at *5, *8 (E.D. Wis. Sept. 10, 2019).

The guiding inquiry, then, is not what the MOU calls itself, but what the parties intended it to be. The Restatement offers the following criteria which may help distinguish a contract from a preliminary agreement:

> The extent to which express agreement has been reached on all the terms to be included, whether the contract is of a type usually put in writing, whether it needs a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether a standard form of contract is widely used in similar transactions, and whether either party takes any action in preparation for performance during the negotiations. Such circumstances may be shown by oral testimony or by correspondence or other preliminary or partially complete writings.

Restatement (Second) of Contracts § 27 (1981).

Construing Plaintiff's allegations as true, as the Court must at this stage, the Court finds that the MOU could constitute a contract. First, the

MOU was apparently signed *after* the purchase order was made, and provides for the rights and obligations of each party over the course of their business transaction—therefore, it is not an "agreement to agree" in the traditional sense. Indeed, because the substance of the exchange had already been agreed upon, it is difficult to characterize the MOU as an "agreement to agree" at all. This is particularly true because the MOU does not contemplate an additional agreement, and instead seems to provide details concerning the purchase order. Specifically, the MOU details how payment will be received, how the shipments will be delivered, and when the agreement will terminate.

Defendant argues that its language disclaiming the MOU as not a "formal undertaking" saves the MOU from being a contract. While this language certainly raises an argument against the parties' intent to be bound, the Court cannot say that it is so explicit as to be dispositive—particularly because it exists amidst a choice of law and choice of jurisdiction provision. In *Sheppard*, for example, the disclaimer clearly stated that there was no contract, and the parties formally "agree[d] that in consideration for the execution of this MOU, the parties do contractually agree that they each waive any rights they may have to bring any claims. . .arising from this MOU." 824 N.W.2d at 912. The *Sheppard* court further observed that the MOU contained several contingencies and lacked specificity as to how several millions of dollars would be transacted—precisely because the parties contemplated another, more detailed agreement. *Id.* By contrast, here, the parties agreed to "strive" to fulfill the "objectives of the MOU," which were to supply and install the bargained-for sirens—not to agree at a later date to terms that would guide the supplying and installation of sirens. (Docket #11-1 at 8).

In light of the rest of the MOU, it simply is not clear that the language regarding a "formal undertaking" is meant to imply that the parties are not bound to the text of the agreement. It certainly raises the possibility, but factual conclusions are impermissible at this stage in the proceedings. Suffice it to say, Plaintiff has adequately alleged that the MOU is a contract that Defendant breached when it failed to deliver satisfactory alarm systems.

### 3.1.2 Wisconsin Commercial Code Contract

Even if it becomes clear, later in the lawsuit, that the parties did not intend to be bound by the MOU, there may still be a contract. Wisconsin applies the Uniform Commercial Code ("UCC") to commercial contract disputes, which is codified in Wisconsin Statutes sections 401.101 *et seq. See Grams v. Milk Prods., Inc.*, 699 N.W.2d 167, 171 (Wis. 2005). The UCC governs this agreement because it relates to a "transaction[] in goods." Wis. Stat. § 402.102. Under the UCC, a contract "need not contain all the material terms" in order to be upheld; "[t]he only term which must appear is the quantity term." Wis. Stat. § 402.201 cmt. 1. Moreover, the UCC provides that "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract." Wis. Stat. § 402.207(3). "In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of chs. 401 to 411," including warranties and various other contractual provisions. *Id.*

Whether considered alone or in tandem with the MOU, the purchase order could be an enforceable contract under the UCC because it specifically states the quantity—i.e., a shipment of 690 sirens, 12 control

points and various implementing parts (each itemized and quantified). The purchase order even goes a step further by providing the price. Moreover, Wisconsin Statutes section 402.207(3) allows for the existence of a contact based on the parties' course of conduct—and the statute of frauds may not be at issue here if the goods were received or "payment [was] made and accepted." *Id.* § 402.201(3)(c). Thus, Plaintiff has adequately alleged the existence of a contract. Plaintiff further alleges that the sirens were deficient, that they lacked necessary component parts, that they were not sent in a timely manner, and that they failed to alert the targeted geographic region along the Eastern Province. Accordingly, under the UCC, Plaintiff has alleged that Defendant breached the contract.

### 3.2 Unjust Enrichment

A plaintiff may plead causes of action in the alternative, even if those claims are inconsistent. Fed. R. Civ. P. 8(d)(2) and (3); *Feeco Int'l Inc. v. Oxane Materials, LLC*, Case No. 13-CV-0869, 2013 WL 5273930, at *2 (E.D. Wis. Sept. 18, 2013) (finding inconsistent equitable pleadings appropriate where the parties disputed the existence of a contract). As discussed above, Defendant denies the existence of a valid and enforceable contract. Thus, in the unlikely event that a contract is not found at the close of discovery, Plaintiff has also pled a cause of action for unjust enrichment. Defendant does not argue that Plaintiff has failed to adequately *allege* a claim for unjust enrichment, only that such a claim is improper because Plaintiff has also pled a claim for breach of contract, and failed to plead the unjust enrichment claim in the alternative. Accordingly, Plaintiff will be granted leave to amend its complaint in order to allege unjust enrichment in the alternative.

### 3.3 Breach of Express and Implied Warranty

Defendant claims that because two sections of the MOU disclaimed legal obligations and a "formal undertaking," (Docket #11-1 at 7–8), there is no breach of express or implied warranty. As discussed above, the effects of the MOU's various provisions are ambiguous and best left for resolution at summary judgment. If the MOU is a valid contract, then Plaintiff has adequately alleged breach of the express warranties contained therein. *See* (Docket #11-1 at 2–5) (discussing the agreement's objectives and the parties' roles and responsibilities). However, if the MOU effectively disclaimed liability as to its stated terms, or is otherwise found to be invalid, Plaintiff has still alleged breaches of express and implied warranty under the UCC. Plaintiff's allegations regarding express and implied warranty will be discussed below.

#### 3.3.1 Express Warranty

Under the UCC, an express warranty by the seller can be created in one of the following ways:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

Wis. Stat. § 402.313(1).

The MOU contains specific assurances under the "objectives" subsection, including that the hardware would be guaranteed for five years

as free of defects, that the sirens themselves have a warranty of two years, and that available spare parts for software or hardware would be available for at least ten years. (Docket #11-1 at 4). Plaintiff has alleged that the sirens did not emit enough sound to properly alert people along the Eastern Province of Saudi Arabia, that one of the required components was never shipped to Plaintiff due to a change in the original design, and that the entire siren system, once installed, was defective and not the same product that Defendant had shown Plaintiff during their meeting in Milwaukee. Thus, Plaintiff has adequately alleged a breach of express warranties.

Additionally, during Plaintiff's visit to Milwaukee, Defendant demonstrated a model siren system consisting of up-to-date software and technology, and claimed that this was the exact version that they would furnish to Plaintiff. However, after receiving and putting together the siren system, Plaintiff alleges that it was "a wholly different product which did not function according to the specifications provided to Defendant." (Docket #11 ¶ 92). Specifically, it lacked necessary component parts and failed to emit sufficient sound. Accordingly, Plaintiff has sufficiently alleged breach of express warranty in this respect, as well.

### 3.3.2 Implied Warranty

Subject to certain exceptions which are not alleged to be present here, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Wis. Stat. § 402.314(1). A good is merchantable if, among other requirements, it is "fit for the ordinary purposes for which such goods are used" and "run[s], within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units

Page 14 of 20
Case 2:20-cv-00178-JPS   Filed 07/20/20   Page 14 of 20   Document 20

involved." *Id.* § 402.314(2)(c),(d). Additionally, the UCC provides an implied warranty of fitness

> [w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified. . .an implied warranty that the goods shall be fit for such purpose.

Wis. Stat. § 402.315.

Here, absent an exclusion or modification to the agreement, the sirens and component parts sold to Plaintiff by Defendant would have been warranted as "fit for the ordinary purposes for which [the sirens] are used," and fit for alerting people along the Eastern Province of Saudi Arabia. Wis. Stat. §§ 402.314(2); 402.315. Plaintiff alleges that "the sirens failed to emit sufficient sound so as to effectively alert those located within the respective geographic target areas and Defendant's product did not otherwise meet the agreed upon specifications and requirements." (Docket #11 ¶ 33). Therefore, Plaintiff has adequately alleged a breach of implied warranty.

Defendant counters that Plaintiff's complaint includes allegations suggesting that Plaintiff had a reasonable opportunity to inspect the goods and failed to do so, because Plaintiff received the first shipment in June 2015 and did not note problems with the sirens until January 2016. *See* (Docket #11 ¶¶ 24, 27). However, the complaint also alleges that Plaintiff repeatedly objected to the goods as non-conforming "at all times relevant," and that the deficiencies were not corrected. (Docket #11 ¶¶ 37, 42); *see also* Wis. Stat. § 402.607(3)(a) ("The buyer must within a reasonable time after the buyer discovers or should have discovered any breach notify the seller of breach

or be barred from any remedy. . . ."). The Court must accept these allegations as true, and allow Plaintiff's claim to proceed.

Defendant also argues that Plaintiff was able to fully examine the model provided in Milwaukee, and failed to raise any issues. According to Defendant, Plaintiff has pled itself out of this claim because "when the buyer before entering into the contract has examined the goods or the sample or model as fully as the buyer desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to the buyer." Wis. Stat. § 402.316(3)(b). Assuming the allegations in the complaint are true, Plaintiff alleges that the sirens were quieter than expected and defective *once installed*—suggesting that this defect would not have been revealed upon examination of the model, or even upon receipt. Whether this is true is an entirely different question, one that is properly resolved either at summary judgment or trial. At this juncture, Plaintiff has stated a claim for a breach of implied warranty.

### 3.4 Fraudulent Inducement

Wisconsin courts recognize claims for fraudulent inducement as a narrow exception to the economic loss doctrine if "the fraud is extraneous to, rather than interwoven with, the contract." *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205, 219 (Wis. 2005). By way of background, the economic loss doctrine "preserve[s] the distinction between contract and tort by requiring transacting parties to pursue only their contractual remedies when asserting an economic loss claim." *Id*. at 216. It furthers various policies, including "(1) maintaining the distinction between tort law and commercial law; (2) protecting the freedom of commercial parties to allocate economic risk by contract; and (3) encouraging the purchaser—

Page 16 of 20
Case 2:20-cv-00178-JPS   Filed 07/20/20   Page 16 of 20   Document 20

viewed by the Courts as the party best able to assess the risk of economic loss—to assume, allocate, or insure against such risk." *Triad Grp., Inc. v. Vi-Jon, Inc.*, 870 F. Supp. 2d 645, 650 (E.D. Wis. 2012) (citing *Ins. Co. of N. Am v. Cease Elec., Inc.*, 688 N.W.2d 462, 467 (Wis. 2004); *Van Lare v. Vogt, Inc.*, 683 N.W.2d 46, 51 (Wis. 2004); *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 573 N.W.2d 842, 846 (Wis. 1998)). In other words, the economic loss doctrine precludes "contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." *Van Lare*, 683 N.W.2d at 51 (quoting *Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 241 (Wis. 2004)).

In order to state a claim for fraudulent inducement, a plaintiff must first allege facts supporting a claim for intentional misrepresentation, which requires the following five elements:

> (1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to his/her detriment.

*Kaloti Enters., Inc.*, 699 N.W.2d at 211 (citations omitted). "An intentional misrepresentation claim may arise either from a failure to disclose a material fact or from a statement of material fact which is untrue." *Id.* (internal quotation marks omitted). Additionally, a plaintiff must allege that "the misrepresentation occurred before the contract was formed" and that "the fraud was extraneous to, rather than interwoven with, the contract." *Id.* at 219 (citations and quotations omitted).

An intentional misrepresentation is extraneous to the contract if it "concern[s] matters whose risk and responsibility did not relate to the quality or the characteristics of the goods for which the parties contracted or otherwise involved performance of the contract." *Hinrichs v. Dow Chem. Co.*, 937 N.W.2d 37, 47 (Wis. 2020). For example, in *Kaloti Enterprises*, the defendant failed to tell the plaintiff about a change in its marketing strategy prior to selling the plaintiff a set of goods—knowing full well that its new marketing strategy would effectively shut out the plaintiff from the same market that it would use to distribute the goods that it purchased from the defendant. *See Kaloti Enters.*, 699 N.W.2d at 212. The Wisconsin Supreme Court found that this misrepresentation was extraneous to the contract because it did not concern the "performance of the contract with [plaintiff] and it d[id] not regard the quality or character" of the goods that the defendant sold to the plaintiff. *Id.* at 220. Rather, it related to "a matter whose risk was never contemplated to be a part of the contract to purchase [defendant's] products." *Id.*

Here, Plaintiff alleges that Defendant made three potential representations before the contract was made. *See* (Docket #17 at 11–12). First, Defendant represented that it had been selling sirens since 1961 without complaint. Second, Defendant "provided a misleading demonstration of the product that was inconsistent with the lower quality of the product it actually delivered." *Id.* And, third, Defendant represented that it was capable of ensuring compliance with Plaintiff's specifications.

However, each of these representations are undeniably extraneous because they are related to the "the quality or the characteristics of the goods for which the parties contracted or otherwise involved performance of the contract." *Hinrichs*, 937 N.W.2d at 47. In *Hinrichs*, the Wisconsin

Page 18 of 20
Case 2:20-cv-00178-JPS    Filed 07/20/20    Page 18 of 20    Document 20

Supreme Court affirmed a motion to dismiss a fraudulent inducement claim where the plaintiff alleged misrepresentation of the effectiveness of an adhesive, because the misrepresentation was related "to the quality and characteristics of the product in question and [was] thus not extraneous to the contract." *Id.* Plaintiff claims that the sirens do not work as promised—either because they do not sufficiently alert the foreseen geographic area, because their component parts are not proper, or because the sirens themselves are different from those that were shown at the meeting in Milwaukee. The alleged misrepresentations each relate to the quality of the product and to Defendant's ability to perform its part of the contract. This is not a matter of sparse or insufficient pleadings; the facts that Plaintiff has pled are clear and simply do not give rise to a claim for fraudulent inducement. Therefore, it is not proper for the Court to consider these statements under the rubric of a fraudulent inducement claim. Accordingly, this claim will be dismissed.

### 3.5 Rescission

Under Wisconsin law, "the equitable remedy of rescission is available when a party is induced to assent to a contract by justifiably relying on a fraudulent or material misrepresentation by the other party." *AVL Powertrain Eng'g, Inc. v. Fairbanks Morse Engine*, 178 F. Supp. 3d 765, 772 (W.D. Wis. 2016). In other words, rescission is a remedy, not a claim. As the Court has dismissed Plaintiff's claim for fraudulent inducement, the remedy of rescission is unavailable.

### 4. CONCLUSION

For the reasons explained above, Defendant's motion to dismiss will be granted in part and denied in part. If Plaintiff chooses to submit an

amended complaint correcting the deficiencies in counts two, four, or five, it must do so not later than fourteen (14) days of the date of this Order.

Accordingly,

**IT IS ORDERED** that Defendant's first motion to dismiss (Docket #7) and Plaintiff's motion for leave to file a sur-reply (Docket #18) be and the same are hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Defendant's second motion to dismiss (Docket #12) be and the same is hereby **GRANTED in part and DENIED in part**;

**IT IS FURTHER ORDERED** that Plaintiff's second, fourth, and fifth claims for relief in its amended complaint (Docket #11 at 11–12 and 16–20) be and the same are hereby **DISMISSED**; and

**IT IS FURTHER ORDERED** that Plaintiff may file a second amended complaint on or before **August 3, 2020** to correct the deficiencies in Plaintiff's amended complaint.

Dated at Milwaukee, Wisconsin, this 20th day of July, 2020.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge